BARRY *v.* MISSOURI, K. & T. RY. Co. *et al.*[1]

*(Circuit Court, S. D. New York.* May 12, 1888.)

1. RAILROAD COMPANIES—BONDS AND MORTGAGES—EXCHANGE OF BONDS.

Where provision is made for retiring a series of secured income bonds of a railroad, and issuing new bonds in exchange, the bonds surrendered to be held by a trust company uncanceled until all are retired, a bondholder who does not consent to render his bonds is not entitled, in an accounting under the mortgage, to claim for interest due him more of the income than his share would have been had no bonds been surrendered.

2. SAME—ACCOUNTING.

In an accounting in favor of income bondholders of a railroad, if the company has seen fit to pay a higher rate of interest than needful upon prior incumbrances, it cannot charge the difference against the income to the injury of the bondholders in direct contravention of the provisions of the mortgage securing the income bonds.

3. SAME.

*Held* that, under the particular facts of this case, an allowance made by the mortgagor to a connecting road for a diversion of earnings should be rejected from the expense account in ascertaining income applicable to the payment of interest.

In Equity.

*J. A. Davenport,* for complainant.

*Winslow S. Pierce, Jr.,* for defendants.

WALLACE, J. This cause is here upon exceptions filed by the railway company and the Mercantile Trust Company to the master's report. By the interlocutory decree of April 26, 1886, it was adjudged that the complainant and the other owners of income mortgage bonds created by the railway company were entitled to an account of the net earnings of the company for each six months from April 1, 1876, the date of the mortgage; and the railway company was accordingly directed to account before the master, in order to ascertain how much the complainant and others similarly situated should receive from the company as owing for interest earned upon the bonds. The decree directed the master to charge the company with its gross earnings and income derived from all the property covered by the mortgage since the execution of the mortgage, and to credit the company with its operating expenses, its expenses for keeping the property in repair, and the sums paid, or which it was liable to pay, for interest upon prior incumbrances, and for taxes and assessments. Upon the accounting thus directed, the master found and reported that the net earnings of the company which should have been applied to the payment of interest upon the bonds, after rejecting the items which the company had sought without right to charge against income, amounted October 1, 1886, to $3,547,012. By the exceptions filed the railway company complains that the master improperly disallowed two items charged against earnings in the income account,—one for interest upon prior incumbrances actually paid by the company, and

[1] See 27 Fed. Rep. 1.

the other for operating expenses in the form of an allowance to the International & Great Northern Railway Company for earnings diverted from that company.

Without repeating the opinion expressed at the hearing of the exceptions why the first item was properly disallowed by the master, it is sufficient for present purposes to state that, if the railway company has seen fit to pay a higher rate of interest upon prior incumbrances than it was liable to pay by its agreement with the owners of these incumbrances, it cannot charge the difference against the income, to the detriment of the income bondholders, in direct contravention of the agreement between the company and the income bondholders recited in the income mortgage.

The second item was, in effect, disallowed by the master, although his ruling was in form only a refusal to permit the railway company to delay the accounting by the issuing of a commission to produce testimony to show the particulars and details of the item. The refusal was put upon the ground, by the master, that the item ought not to be allowed as a charge against net earnings under the terms of the mortgage, if all the particulars and details sought to be proved were proved. It appears that June 1, 1881, five years after the execution of the income mortgage, the railway company leased the railway of the International & Great Northern Railway Company for the term of 99 years, and soon after acquired all the stock of that company, except 300 of the 10,000 shares, and since that time has operated the leased railway. After the interlocutory decree in this cause, compelling the railway company to render an account of its income, and apparently several months after the accounting before the master had commenced, Mr. Gould, who was then president of both railway companies, directed a credit to be made on the books of the Missouri, Kansas & Texas Railway Company in favor of the International & Great Northern Railway Company, as follows: "Allowance to International & Great Northern Railway Company on adjustments of earnings diverted from their company's line to the Missouri, Kansas & Texas Railway, $743,899;" and the same item was charged against income in the income account. This allowance seems to have been the result of a conference between Mr. Gould and the treasurer of the Missouri, Kansas & Texas Railway Company. According to the testimony of the treasurer, the allowance was made on his suggestion, and concurred in by Mr. Gould, upon the theory that the earnings of the International & Great Northern Railway Company were only equal to its fixed charges, and would have been more than its fixed charges had it been allowed to control its business in its own interest exclusive of connections with any other road; and the amount allowed was the difference between fixed charges and operating expenses, which had been advanced to it by the Missouri, Kansas & Texas Railway Company. There was enough, probably, in the origin and history of this item, to justify the master in treating it as a mere matter of book-keeping, or as one manufactured for the purpose of the accounting, and destitute of any real foundation; but he placed his ruling upon the ground that by the terms

of the income mortgage such a disbursement would not fall within the category of expenses incurred in operating and keeping in repair the 786 miles of road covered by the mortgage, and therefore was not a proper charge against income. In this he was clearly correct, and the ruling is fully approved.

The master excluded the Mercantile Trust Company, the holder of coupons and scrip certificates representing $2,028,007 of unpaid interest, from proving its claim against the fund, and ruled that the fund should be distributed wholly to other holders of coupons and scrip. The correctness of this ruling is questioned by exceptions filed in behalf of that corporation, and also by the railway company. It appears that in November, 1883, the railway company resolved upon a plan for exchanging the income mortgage bonds for the bonds of a general consolidated mortgage created December 1, 1880. By the terms of the resolutions of the board of directors embodying this plan, it was provided that all income bonds offered for exchange should be deposited with the Mercantile Trust Company as trustee, and held uncanceled as security for the new bonds until all the income bonds should be retired; and that the coupons and scrip certificates for unpaid interest upon the bonds offered for exchange should be retired at 60 per cent. of their face value, flat, payable in the new bonds. At the time of the hearing before the master the greater part of the income bonds, with coupons attached representing $1,307,205 unpaid interest, had been exchanged with the company for the new bonds, pursuant to this plan, and were deposited with the Mercantile Trust Company, and held by it uncanceled; and scrip certificates to the amount of $715,630 had also been exchanged for the new bonds, and were deposited with the Mercantile Trust Company, and held by it uncanceled. The scrip certificates represent overdue interest coupons, which were detached from the bonds at the time of the exchange; and the coupons are those which were attached to the bonds at the time of the exchange, and have matured subsequently. The theory upon which the master ruled that these coupons and scrip certificates should not be allowed to share in the interest fund earned by the railway company was that they had been paid and satisfied by the railway company, the exchange being in legal effect a payment and satisfaction. According to his view, the holders of coupons and certificates who did not exchange them for new bonds are entitled to the whole interest fund until they have received their 6 per cent. annual payments. It is quite immaterial whether the securities excluded from sharing in the interest fund are to be regarded as belonging to the Mercantile Trust Company, and treated as held in trust by that corporation for the benefit of the income bondholders who have consented to exchange their bonds for the new bonds, or whether they are regarded as really belonging to the railway company, and treated as held for its benefit by the trust company. The essential question is whether the railway company must pay over to the holders of outstanding coupons and certificates the whole interest fund, or enough of it to render them 6 per cent. interest, with interest upon interest, by way of damages, or whether it must pay to them only

such proportion as the amount of their respective coupons and certificates bears to all the interest payable by the terms of the income mortgage. It seems plain that the holders of income bonds, or of coupons or certificates representing unpaid interest on the bonds, who did not consent to surrender them in exchange for new bonds, are not entitled to any larger share of the interest fund than they would be if none of the original issue of bonds, or no coupons or scrip certificates, had ever been surrendered. It was competent for the railway company, in carrying out its scheme of refunding, to agree with the holders of income bonds, coupons, or certificates that, upon their exchange of their securities for new bonds, those surrendered should not be deemed paid, but should be kept alive to protect them against any enlarged claims of non-assenting holders; and, if such an agreement was made, the surrendered securities are to be regarded as held in trust by the trust company for the benefit of those who surrendered them. Ordinarily such an agreement, or some other arrangement for the protection of those who surrender securities, having a prior lien for securities secured by a junior mortgage, is one of the features of the refunding schemes of corporations. The rights of non-assenting bondholders cannot be prejudiced by any action on the part of the corporation and assenting bondholders in substituting new bonds for old; but it has sometimes been supposed that, if the refunding plan should assume the form of a payment of the old bonds, and an exchange of new bonds in satisfaction, the non-assenting holders of old bonds might acquire a priority which they did not have originally. Thus, in the case of *Ames* v. *Railroad Co.*, 2 Woods, 206, the railway company had executed a mortgage to secure a limited number of bonds, and afterwards executed another mortgage on the same property to secure a larger number of bonds, which recited that the holders of the bonds secured by the first mortgage had agreed to surrender the same, and receive in substitution therefor new bonds to be secured by the first mortgage, as modified by the second mortgage; and all the bonds secured by the first mortgage except 20 were exchanged for bonds secured by the second. Upon foreclosure the holders of the 20 bonds claimed that they were entitled to be paid out of the proceeds of the mortgaged property in preference to the holders of the new bonds, who had surrendered their old bonds in exchange, so that the proceeds which would have been divided among 2,825 bonds, the number originally secured by the first mortgage, should be first appropriated to pay the 20 bonds which had not been surrendered. But the court held that, while those holders who had not surrendered their bonds were entitled to have their rights preserved unaffected by what had taken place, equity would be done by giving them such part of the proceeds of the sale as they would have been entitled to if the new bonds and mortgage had never been executed; in other words, that they were entitled to 20.2825 of the proceeds of the sale, and no more. In that case, however, the court placed some emphasis upon the circumstance that there was an express understanding between the corporation and those bondholders who consented to the exchange that the first mortgage should stand for the benefit of the new

bonds. But suppose there is no express understanding between the corporation and assenting bondholders that the original security is to be kept alive for their protection, how are the rights of non-assenting bondholders enlarged by the surrender or payment of part of the bonds originally covered by the mortgage? No new contract is made with them by which their rights or their original liens are amplified. If it becomes necessary to enforce their mortgage, complete equity is done them if they are awarded the same share of the proceeds of the property which they would have received if no bonds had been surrendered. If, by the terms of the contract, the whole property covered by a mortgage created to secure an issue of bonds is pledged to each bondholder, then, indeed, he may rightfully insist that he shall not be deprived of the fruits of his pledge by any subsequent dealings between the mortgagor and other bondholders to which he has not assented; and consequently he could reasonably claim that, if part of the debt to the payment of which the property was originally pledged has been extinguished, the proceeds of the property in case of a foreclosure must be applied to pay the balance before any other appropriation can be made of them. But such is not the contract implied between a bondholder and a mortgagor when the mortgage purports to secure a series of which his bond is one. The contract is that he shall receive the *pro rata* share of the whole security which his bond bears to the whole series. In *Claflin* v. *Railroad Co.*, 4 Hughes, 12, 8 Fed. Rep. 118, certain mortgage bonds had been acquired by the corporation in refunding operations, and the question arose whether the company, after having acquired them, could keep them alive, and reissue them, so that they would carry with them their original mortgage lien. Chief Justice WAITE, in deciding the case, said:

"As against other bondholders secured by the same mortgage, I cannot believe there is a doubt of the power of the company to put out and keep out the entire issue up to the time the bonds became due. The contract with the individual bondholder was no more than that he shall have his due proportion of the security the mortgage on its face implies."

Where a mortgage is security for the whole number of a series of bonds, in a distribution of the proceeds of the sale of the mortgaged property each bond carries only a fractional interest in the proceeds of the property, to be ascertained by the proportion which its amount bears to the whole amount secured; and the holder of such a bond has no interest in the question whether holders of other bonds have title or not. *Hodges'* *Appeal*, 84 Pa. St. 359. There is no principle in the law of corporations or of mortgages which forbids a corporation that has issued a series of mortgage bonds from purchasing part of them back, and reissuing them again before their maturity, when the financial interests of the corporation will be thereby promoted, unless the organic law of the corporation prohibits the exercise of such a power. If it is lawful for the corporation to do this, it is wholly immaterial whether it pays money upon such a purchase, or exchanges other bonds instead. And if it should destroy the bonds purchased, and issue duplicates, not intending to extinguish the debt evidenced by the bonds, the lien of the mortgage would

not be affected by the substitution of the new bonds. *Watkins* v. *Hill*, 8 Pick. 522; *Pomroy* v. *Rice*, 16 Pick. 22; *Brinckerhoff* v. *Lansing*, 4 Johns. Ch. 65; *Dana* v. *Binney*, 7 Vt. 501. Of course, payment with intent to extinguish the debt would extinguish the lien.

In the present case the railway company intended that the income bonds exchanged for new bonds should remain with the trust company uncanceled until all the income bonds should be retired, and the resolutions embodying the refunding scheme distinctly provides for this; and although the language of the resolution, with reference to the coupons and scrip certificates representing the interest on the bonds, stated that they were to be "retired at sixty per cent. of their face value" in new bonds, it cannot be doubted that the company did not intend them to be canceled. They were not canceled, but were deposited with the trustee, as were the bonds. It is conceded that the bonds were kept alive upon the exchange, and it is difficult to see how the slight difference of phraseology employed to describe the mode of retiring the coupons and scrip certificates can work any substantial difference in the effect of the transaction as to them. The coupons and certificates are nothing more than evidence of the promise contained in the bonds for the payment of interest. The lien of the income bondholders upon the income of the company for the payment of their interest cannot extend beyond the contract of hypothecation as evidenced by the bonds and the mortgage when read together. The lien of coupon or certificate holders is but the lien the bondholders have for interest. The income mortgage was created to secure a series of bonds for the sum of $1,000 each, amounting in the aggregate to $10,000,000. Each bond contains a promise to pay the bearer from the net or surplus earnings of the railway company interest semi-annually at the rate of 6 per cent. per annum; and recites that the whole series of bonds are secured by the mortgage, and that the income of the property covered by the mortgage is pledged to the payment of the interest thereon. Manifestly the contract between each bondholder and the railway company authorized the latter to issue 10,000 bonds. It is also manifest that the railway company only bound itself to pay interest to each bondholder to the extent of his proportion of its semi-annual income. Consequently the railway company would satisfy its obligation to each holder of a $1,000 bond by paying him one ten-thousandth part of its annual net income as interest on his bond. If this is a correct view of the contract between the company and the bondholder, it is obvious that neither the rights of the bondholder would be enlarged, nor the obligation of the railway company changed, by any increase or decrease in the amount of bonds issued. If the company had issued but 5,000 of the 10,000 bonds, or if it had issued the whole number, and had then called in and purchased some of them, and then put them out again, it would have made no difference in the rights of an individual bondholder. So, if the exchange of bonds is deemed equivalent to a payment of those surrendered, as well as of the coupons and certificates, the bondholders of outstanding bonds, coupons, or certificates occupy no different relation to the interest fund, and have no larger

lien upon it, than before. The fallacy of the position of the complainant, and the other holders of coupons and scrip not surrendered, is in the notion that by the contract of hypothecation the whole income of the railway company, to the extent of 6 per cent. annually, was pledged to the payment of the interest upon each bond. If this were true, and the claims of some of those who were originally entitled to share in the income fund had been extinguished by payment, the residue of the fund would inure to those whose claims remain unsatisfied. But the contract was that the company should distribute the income ratably among 10,-000 bonds for $1,000 each, so as to pay each bondholder his share. This share constitutes the whole interest of the holders of outstanding coupons or certificates in the income fund.

The report is recommitted to the master to ascertain the rights of the parties to the fund in accordance with these views.