SLUPSKY v. WESTINGHOUSE ELECTRIC & MFG. CO. et al.

BUROW et al. v. SAME.

Nos. 10145, 10146.

Circuit Court of Appeals, Eighth Circuit.
July 12, 1935.

Rehearing Denied Oct. 2, 1935.

See, also, In re St. Louis Public Service Co. (D. C.) 8 F. Supp. 83.

Hyman G. Stein and Victor Packman, both of St. Louis, Mo. (Byron F. Babbitt, of St. Louis, Mo., on the brief), for appellants.

Charles H. Daues and T. E. Francis, both of St. Louis, Mo. (B. G. Carpenter, of St. Louis, Mo., on the brief), for appellee Henry W. Kiel, receiver of St. Louis Public Service Co.

Walter H. Pollak, of New York City (Stanley Clarke and Samuel J. Silverman, both of New York City, on the brief), for appellee St. Louis Public Service Co.

Before GARDNER, SANBORN, and FARIS, Circuit Judges.

SANBORN, Circuit Judge.

These appeals grow out of the receivership of the St. Louis Public Service Company (hereinafter referred to as "Service Company") which owns and operates a street railway and bus system in St. Louis, Mo. The receiver was appointed as the result of a suit brought by Westinghouse

Electric & Manufacturing Company against the Service Company. One of the appeals is from an order denying the petition for intervention of Abraham Slupsky, the holder of $23,000 face value of bonds of United Railways Company (hereinafter called "Railways Company") which were assumed by the Service Company. The other appeal is from an order denying a similar petition of F. A. Burow and other judgment creditors of the Service Company.

The Railways Company was incorporated under the laws of Missouri in 1899 for the purpose of owning and operating a street railway system in St. Louis. It was authorized to issue $45,000,000 of bonds, to be secured by a trust deed upon its properties. It actually issued and sold $36,300,-000 of such bonds. From 1919 to December 1, 1927, it was in receivership.

A committee, seeking to reorganize the Railways Company, on October 1, 1924, purchased $6,000,000 of its bonds from the receiver, and pledged them as collateral for a loan of $4,100,000.

The Service Company, also a Missouri corporation, on December 1, 1927, acquired the assets of the Railways Company at foreclosure sale, subject to the trust deed securing the $36,300,000 of outstanding bonds, which bonds the Service Company assumed and agreed to pay. The Service Company agreed to purchase and retire each year a minimum amount of these bonds; at least $350,000 in 1927, and at least $175,000 in each calendar year thereafter. It also assumed and agreed to pay the $4,100,000 loan of the reorganization committee.

On December 6, 1927, the Service Company proposed to holders of bonds of the Railways Company that it would purchase such bonds up to the amount of $9,000,000 face value, at $875 per bond, $600 of which was to be paid in cash, and the balance by a 6 per cent. gold note of the Service Company. In order to secure the necessary funds to purchase these bonds, the Service Company entered into an agreement with a group of banks, including the First National Bank in St. Louis, which was to act as loan manager. By this agreement, the banks were to lend the Service Company, during the year 1928, $10,000,000, $4,100,-000 of which was to be used to refund the loan of the reorganization committee. The $10,000,000 loan was to be secured by the pledge of $15,000,000 of United Railway bonds, $9,000,000 of which were to be ac-quired with proceeds of the loan, the remaining $6,000,000 being bonds pledged by the reorganization committee as collateral to the $4,100,000 loan. Pursuant to this arrangement, the Service Company borrowed from the banks $10,000,000, which was disposed of as follows: $5,400,000 was paid to the holders of $9,000,000 of bonds; $4,100,000 was used to refund the loan of the reorganization committee; and the balance was used by the Service Company for corporate purposes. The acquisition of the $9,000,000 of bonds was handled in this manner: The bonds were deposited by their holders with the First National Bank in St. Louis as loan manager for itself and the other banks, and it paid to the holders, for each $1,000 bond deposited, $600 in cash derived from the proceeds of the $10,000,000 loan, and delivered to them a $275, 6 per cent., gold note of the Service Company. The First National Bank retained the bonds thus acquired, as collateral security, without having actually at any time delivered or transferred them to the Service Company.

Thereafter the Service Company, upon demand of the banks, and in connection with the renewal from time to time of its $10,000,000 loan, deposited, as additional collateral security, $1,626,000 of the bonds of the Railways Company. These bonds were acquired by the Service Company by purchases upon the market.

About April 12, 1933, the banks called the $10,000,000 loan for payment. The Service Company was unable to pay, and the receivership followed.

Shortly after the appointment of the receiver, and on May 8, 1933, Abraham Slupsky filed his petition for leave to intervene for the purpose of having the pledge of the $9,000,000 of bonds and the subsequent pledge of $1,626,000 of bonds declared invalid upon the ground that such pledges were in effect issues of bonds for which no money, labor, or property was received, and constituted the creation of fictitious indebtedness, contrary to the Constitution and laws of the state of Missouri.

Some five months later, the receiver filed a report, and applied to the court for instructions relative to the recapture of the pledged bonds. In his report and application, he fully informed the court as to the pledges and the circumstances under which they were made, and expressed the opinion that the pledge of $9,000,000 of bonds was a valid pledge.

The court heard the receiver's application for instructions. Slupsky and his counsel, who were present, were invited and requested to participate in this hearing, but refused. At the conclusion of the hearing upon the receiver's application, the court heard Slupsky's petition to intervene. The court found the pledge of the $9,000,000 of bonds to be valid, but directed the receiver to institute an action to test the validity of the pledge of the $1,626,000 of the bonds of the Railways Company given as additional security, and denied the petition of Slupsky for intervention. Thereafter, the appellant Burow and other judgment creditors, acting through the same attorneys who represented Slupsky, filed a similar petition to intervene, which the court also denied. These appeals followed.

It appears that on June 14, 1934, the orders which had been made in the receivership were carried over into a debtor-trustee proceeding instituted under section 77B of the amended Bankruptcy Act (48 Stat. 912, 11 USCA § 207).

The appellants contend: (1) That they had an absolute right to intervene in the receivership proceeding; and (2) that if intervention by them was discretionary with the court, it should have granted their applications, for the reason that the receiver was hostile to them and that the pledge of the $9,000,000 of bonds was void, (a) because the acquisition by the Service Company of the bonds amounted to payment and cancellation, (b) because the Constitution and laws of Missouri prohibited the pledging of these bonds.

It is apparent that since the appellants were denied intervention after having refused to participate in the hearing upon the application of the receiver for instructions, they are hardly in a position to attack the validity of so much of the order of the court as related solely to that matter. However, the basis for the order disposing of the receiver's application for instructions was also the basis for the denial of the petitions for intervention. Therefore, the correctness of the court's conclusion as to the validity of the pledge of the $9,000,000 of bonds is a proper matter for consideration upon these appeals.

The first question which it is necessary to determine is whether the appellants had an absolute right to intervene for the purpose of challenging the validity of the pledge of the $9,000,000 of bonds. If they had such a right, it is clear that the court below erred in denying their petition. The appellants, however, claim no right, title, or interest in the pledged bonds. The effect upon the appellants of the recapture of the bonds would be no different than its effect upon all other creditors of the Service Company similarly situated. If the appellants had an absolute right to intervene, then every other bondholder and every other judgment creditor had an equal right. It seems clear to us that the appellants had no absolute right to intervene.

In Swift v. Black Panther Oil & Gas Co. (C. C. A. 8) 244 F. 20, page 30, this court stated the rule as follows: "In intervention there are two classes of cases —one class in which the intervention is not indispensable to the preservation or enforcement of the claim of the petitioner, and there the permission to intervene is discretionary with the court; another class in which the petitioner claims a lien upon or an interest in specific property in the exclusive jurisdiction and subject to the exclusive disposition of a court, and his interest therein can be established, preserved, or enforced in no other way than by the determination and action of that court. The petitioner, who has a claim of the latter class, has an absolute right to intervene in the proceeding in which the court holds the exclusive custody and dominion of the property, permission for him to intervene is not discretionary with the court, and he may review by appeal an order refusing that right."

In Whittaker et al. v. Brictson Mfg. Co. et al. (C. C. A.) 43 F.(2d) 485, at page 489, we said: "Intervention, which rests upon Equity Rule 37 [28 USCA following section 723], is not a matter of absolute right in every instance, as pointed out by this court in Palmer v. Bankers' Trust Co. et al., 12 F.(2d) 747, 752. Intervention may, however, be a matter of right, as stated in the same case, 'where the petitioner, not being already fairly represented in the litigation, is asserting a right which would be lost or substantially affected if it could not be asserted at that time and in that form. In such cases the right of intervention is often termed absolute.' United States Trust Co. of N. Y. et al. v. Chicago Terminal Transfer R. Co. et al. (C. C. A.) 188 F. 292; Central Trust Co. of N. Y. v. Chicago, R. I. & P. R. Co. et al. (C. C. A.) 218 F. 336; Glass v. Woodman et al. (C. C. A.) 223 F. 621; Credits Commutation Co. v. United States, 177 U. S. 311, 20 S. Ct. 636,

44 L. Ed. 782. While intervention under some circumstances may be a matter of right, if properly presented to the court, it is generally a matter of sound legal discretion exercised in line with recognized judicial standards in the interest of justice. If the court has abused its discretion the appellate court may review its order."

The following language is found in Radford Iron Co., Inc., v. Appalachian Electric Power Co. (C. C. A. 4) 62 F.(2d) 940, 943: "It is only when he who seeks to intervene has a direct and immediate interest in a res, the subject of the suit, and cannot otherwise protect his interest, that the right of intervention is absolute, and a denial is the subject of an appeal. United States v. California Canneries, 279 U. S. 553, 556, 49 S. Ct. 423, 73 L. Ed. 838; see, also, Board of Drainage Commissioners of Pender County Drainage Dist. No. 4 v. Lafayette Southside Bank of St. Louis (C. C. A.) 27 F.(2d) 286, 287, 293; Elkins v. First National Bank (C. C. A.) 43 F.(2d) 777, 779."

See, also, Simkins' Federal Practice, § 716, p. 673; United States v. California Co-Operative Canneries, 279 U. S. 553, 556, 49 S. Ct. 423, 73 L. Ed. 838; Elkins et al. v. First National Bank of City of New York (C. C. A. 4) 43 F.(2d) 777, 779; Palmer v. Bankers' Trust Co. et al. (C. C. A. 8) 12 F.(2d) 747, 752; Austin et al. v. Garard et al. (C. C. A. 7) 61 F.(2d) 129; Consolidated Gas Co. of New York v. Newton, Atty. Gen., et al. (D. C. S. D. N. Y.) 256 F. 238, 245, 246.

The petition of the appellants for intervention was addressed to the discretion of the court below, and if the court was justified in reaching the conclusion that the pledge of the $9,000,000 of bonds was a valid pledge, the court was certainly justified in denying intervention.

■ It is argued, however, that since the receiver expressed the opinion that the pledge of the $9,000,000 of bonds was valid, he must be regarded as having adopted an attitude hostile to the appellants, and that therefore they became entitled to have their petition allowed.

Even if it be assumed that the opinion of the receiver was erroneous, it would not amount to a demonstration of hostility. The facts surrounding the pledge were all admitted, and the receiver was justified in giving the court the benefit of the conclusion which he had reached as to the validity of the pledge.

■ The appellants assert that the bonds were not purchased, but were paid and canceled. They point to the agreement of the Service Company to purchase and cancel a minimum amount of bonds each year. They claim that this agreement precluded the Service Company from acquiring the bonds, except for cancellation. The short answer to that contention is that the banks acquired these bonds under their agreement with the Service Company, which expressed the intention and purpose that these particular bonds should not be paid and canceled, but should be purchased, deposited with the banks, and held as collateral.

Whether the acquisition of bonds by the corporation which issues them amounts to payment and cancellation, or to a purchase, depends upon the intention of the parties. Virginia Securities Corporation v. Patrick Orchards, Inc., et al. (C. C. A. 4) 20 F.(2d) 78, 84; American Brake Shoe & Foundry Co. v. New York Railways Co. (D. C. S. D. N. Y.) 277 F. 261, 281, 282; Ketchum v. Duncan, 96 U. S. 659, 24 L. Ed. 868; Barry v. Missouri, K. & T. Ry. Co. et al. (C. C. S. D. N. Y.) 34 F. 829, 833; Claflin v. South Carolina R. Co. (C. C. S. C.) 8 F. 118, 124; Wood v. Guarantee Trust & Safe Deposit Co., 128 U. S. 416, 424, 9 S. Ct. 131, 32 L. Ed. 472; Venner v. Farmers' Loan & Trust Co. of New York (C. C. A. 6) 90 F. 348, 359; First Trust Co. of Lincoln, Neb., v. Ricketts (C. C. A. 8) 75 F.(2d) 309, 313, 314.

Even had it been shown, which it was not, that the Service Company had violated its agreement to purchase and cancel a minimum amount of bonds each year, that would not have justified a conclusion that the bonds purchased with the funds loaned by the banks and deposited with them under a specific agreement that such bonds were to be held as collateral for the $10,000,000 loan, were paid and canceled.

■ The next contention is that the pledge was void in view of section 8 of article 12 of the Constitution of the state of Missouri, and section 4546, Revised Statutes of Missouri 1929 (Mo. St. Ann. § 4546, p. 1994).

The constitutional provision is: "No corporation *shall issue* stock or bonds, except for money paid, labor done or property actually received, and all fictitious *increase* of stock or indebtedness shall be void." (Italics ours.)

The statutory provision is: "The stock or bonds of a corporation shall be *issued*

only for money paid, labor done or money or property actually received. * * * All fictitious *issues* or *increases* of stock or of bonds of any corporation shall be void." (Italics ours.)

These provisions clearly relate to the original issue of stocks or bonds by a corporation. Their obvious purpose is to prevent a corporation from starting out in life with a serious impairment of its capital, and not to prevent it from pledging bonds which were originally sold for full value and thereafter reacquired for the corporation for the express purpose of being pledged to secure a valid indebtedness.

In Memphis & Little Rock Railroad v. Dow, 120 U. S. 287, page 299, 7 S. Ct. 482, 487, 30 L. Ed. 595, the Supreme Court considered a substantially identical provision of the Arkansas Constitution. The court said: "Recurring to the language employed in the Arkansas constitution, we are of opinion that it does not necessarily indicate a purpose to make the validity of every issue of stock or bonds by a private corporation depend upon the inquiry whether the money, property, or labor actually received therefor was of equal value in the market with the stock or bonds so issued. It is not clear, from the words used, that the framers of that instrument intended to restrict private corporations—at least when acting with the approval of their stockholders—in the exchange of their stock or bonds for money, property, or labor, upon such terms as they deem proper: provided, always, the transaction is a real one, based upon a present consideration, and having reference to legitimate corporate purposes, and is not a mere device to evade the law, and accomplish that which is forbidden."

In Berry v. Rood et al., 168 Mo. 316, page 332, 67 S. W. 644, 649, the Supreme Court of Missouri had under consideration the liability of stockholders who had purchased stock for less than its par value. The court said:

"The report of the referee shows that those defendants who bought shares of the treasury stock bought it in good faith, believing it had been fully paid, although they paid only fifty per cent. of its face value.

"This treasury stock stood in the name of Jos. T. Bascom, trustee, and that fact was an indication to the purchasers that it had been previously issued, and that their purchases were not original takings of the stock. There was nothing in the fact that it was sold by the company at a discount to cause the purchasers to know that it had not been originally paid in full. Such stock is liable to fluctuation. If they had purchased with knowledge of the fact that the stock was unpaid, they would assume towards the creditors of the concern the liability of the original subscriber, jointly with him, or severally, as the creditor might elect; but that is not the fact as to these purchasers, and we hold that they are not liable in this suit."

In Bondurant v. Raven Coal Co. et al. (Mo. App.) 25 S.W.(2d) 566, it was held that a Missouri statute, providing that no note should be considered as payment for corporate stock, applied only to original issue, and not to treasury, stock. The court said, in 25 S.W.(2d) 566, on page 575: "After the corporation has once issued its stock, and the subscriber has paid therefor, the statute is satisfied. A corporation may sell its treasury stock for cash or credit, for par or for market value, or upon any terms that a stockholder could sell."

There is no contention in this case that the bonds in question here were not originally issued for money, property, or labor, or that in the hands of those who deposited them with the First National Bank they were not valid and enforceable obligations of the Service Company. We think there would be no justification for holding that the rights of the banks as the pledgees of these bonds were inferior to the rights of those from whom the bonds were acquired.

The making of the loan and the pledging of the bonds created no fictitious increase of indebtedness of the Service Company. The bonds had been issued by the predecessor of the Service Company. They were obligations of the Service Company because of its agreement to pay them. They were acquired by the First National Bank with funds that it and its participating banks had loaned to the Service Company, and with notes of the Service Company, under a specific agreement that the bonds so acquired should stand as security. Each of the bonds, representing an indebtedness of $1,000, was to be acquired for $875. Had the Service Company been able to carry out its agreement, the transaction would have resulted in a reduction, and not in an increase, of its indebtedness. If the indebtedness of the Service Company is ultimately increased by reason of the fact that the banks may be required to sell

these bonds upon the foreclosure of the pledge, that increase is not due to the agreement with the banks, but to the default of the borrower. The mere inability of the Service Company to carry out its agreement cannot convert a real indebtedness into a fictitious one.

See Atlantic Trust Co. v. Woodbridge Canal & Irrigation Co. (C. C. Cal.) 79 F. 842; In re Sharon-Warren Iron & Metal Co. (D. C. Pa.) 7 F.(2d) 475.

The cases of Kemmerer et al. v. St. Louis Blast Furnace Co. et al. (C. C. A. 8) 212 F. 63, and Mudge v. Black, Sheridan & Wilson et al. (C. C. A. 8) 224 F. 919, relied on by the appellants, are distinguishable on two grounds: (1) In those cases the pledge was made to secure an antecedent indebtedness; and (2) the bonds pledged were of an original issue, and not bonds which had been lawfully issued and thereafter reacquired.

The constitutional and statutory provisions relied upon by the appellants did not prevent the Service Company from pledging the $9,000,000 of bonds to secure its indebtedness to the banks.

Our conclusion is that the court below, upon the facts presented to it, was correct in concluding that the pledge of the $9,000,000 of bonds was a valid pledge, and was therefore justified in entering the orders denying the petitions of the appellants.

The orders appealed from are affirmed.