547 So.2d 415 (1989)
Sam BRUMFIELD, et al.
v.
Luther A. HORN, Jr., and Old Towne Builders, Inc.
87-1248.
Supreme Court of Alabama.
April 7, 1989.
Rehearing Denied June 16, 1989.
*416 James Jerry Wood, Charles L. Anderson and Elizabeth P. Patterson of Wood & Parnell, Montgomery, for appellants.
Mark D. Wilkerson and Robert Bruce Rinehart of Haskell, Slaughter & Young, Montgomery, for appellees.
JONES, Justice.
Defendants Sam Brumfield, Fred Satterfield, W. Ree Scott, and Dependable Sheet Metal, Inc. ("Dependable"), appeal from a judgment holding that plaintiff Old Towne Builders, Inc. ("Old Towne"), acting through Luther A. Horn, Jr., must be allowed to vote at the shareholders' meeting of South Central Holding Company, Inc. ("SCHC").
Plaintiffs sought a temporary restraining order, a preliminary injunction, and an order 1) declaring Old Towne to be a lawful holder of 30,650 shares of stock in SCHC; 2) declaring the action of the SCHC board of directors in calling the "demand" note from Old Towne unlawful and void; and 3) enjoining the defendants from taking any action that would interfere with the voting rights of Old Towne as holder of the 30,650 shares of SCHC stock. After a hearing, the trial court consolidated the hearing on the motion for a temporary restraining order with a hearing on the merits of the complaint and entered a final judgment the subject of this appeal.
A brief history of the events that led to the initial lawsuit is necessary to fully understand this case. The sole asset of SCHC is 100% of the outstanding stock in Eastgate Mall, Inc., which holds a longterm lease on certain real property in Montgomery, Alabama. Horn, one of the five original incorporators of SCHC, has served on its board of directors since its formation. Later, defendants Brumfield, Satterfield, and Dependable purchased stock in SCHC; and the two individuals are currently members of its board of directors. Defendant Scott is both the secretary of SCHC and a member of its board of directors.
Following the formation of SCHC, Horn transferred his stock to Charles D. Bonner, who at that time also owned additional shares in SCHC. Bonner later pledged this stock to Farmers and Merchants Bank (now Colonial Bank) of Foley, Alabama, as collateral. Horn's transfer to Bonner allegedly violated a corporate bylaw that placed certain restrictions on the transfer of SCHC stock. Subsequently, Bonner filed a petition for bankruptcy, and Colonial Bank obtained title to the SCHC stock pledged by Bonner.
In January 1986, a group of stockholders, including most of the appellants, filed suit, challenging that stock transfer. On May 20, 1987, the parties to that lawsuit signed an agreement that allegedly ended the 1986 lawsuit. Under the terms of that agreement, SCHC was to reacquire 30,650 shares of its own stock from Bonner and Colonial Bank. The agreement further provided that a stockholders' meeting would be held to elect a new five-man board of directors, one member of which *417 would be Horn, and that Horn would be named president and chief executive officer of SCHC. The agreement provided that once the stock was acquired it was to be turned over to Horn and his heirs and assigns. Horn subsequently instructed the defendants to issue the stock in the name of Old Towne, as his assignee. Under the agreement, Horn, acting for Old Towne, was obligated to pay SCHC $140,000, the same amount paid by SCHC to Colonial Bank.[1] This money was to be paid out of the dividends on this stock as they were declared.
On September 15, 1987, the circuit court approved a settlement of the 1986 lawsuit, conditioned on approval by the bankruptcy court and upon satisfaction of all the terms and conditions contained in the settlement agreement. The September 15 settlement agreement did not mention the May 20 agreement. On February 17, 1988, there was a meeting of the SCHC board of directors, at which the terms of the May 20 agreement were carried out. This meeting was also considered a shareholders' meeting. Horn was elected to the board and was named president and chief executive officer, and the board agreed to sell to his assignee, Old Towne, the 30,650 shares of SCHC for $140,000, which was to be evidenced by a promissory note. On that same day, Horn, representing Old Towne, tendered a promissory note for $140,000 to SCHC to pay for the shares. That note states that it was "payable when debt is due". Since the signing of the note, no dividends have been paid by SCHC.
At an SCHC board of directors meeting in June 1988, a motion was made, and passed, to call the "demand" note that Old Towne had tendered for the stock. At that meeting, Horn was allegedly told that he would not be allowed to vote the 30,650 shares of stock at the next shareholders' meeting. On July 1, 1988, Horn and Old Towne filed suit to ensure that Horn would be allowed to exercise Old Towne's voting rights at the shareholders' meeting. The resulting judgment is the subject of this appeal.
Several preliminary issues must be dealt with before determining the propriety of the judgment in favor of Horn and Old Towne. The first issue is whether a promissory note can be given as payment for the purchase of treasury stock; next, the note in question must be examined to determine if it is in fact a demand note; and, finally, this Court must determine if the relief granted was appropriate in the present case.

I. The "Promissory Note for Treasury Shares" Issue
The appellants, citing both case law and statutes, contend that it is improper to sell treasury stock in exchange for a promissory note. We disagree. We hold that a promissory note can be valid consideration for the purchase of treasury stock. We begin our analysis by examining the statutory definitions used to describe the stock of a corporation. Ala.Code 1975, § 10-2A-2, defines both "authorized shares" and "treasury shares":
"(2) AUTHORIZED SHARES. The shares of all classes which the corporation is authorized to issue.
"....
"(18) TREASURY SHARES. Shares of a corporation which have been issued, have been subsequently acquired by and belong to the corporation, and have not, either by reason of the acquisition or thereafter, been cancelled or restored to the status of authorized but unissued shares. Treasury shares shall be deemed to be `issued shares,' but not `outstanding shares.'"
The terms "issued shares" and "outstanding shares" are not expressly defined in the Alabama Code, but their definitions can be found in other sources.
"The issued shares are the amount of its authorized capital that has been subscribed for and paid in. In other words, the issued stock of a corporation is that *418 part of the authorized stock that has been sold or otherwise issued. The outstanding stock is that which is in the hands of the public, excluding treasury shares."
11 W. Fletcher, Cyclopedia of the Law of Private Corporations, § 5082, at 20 (perm. ed.1971). It is undisputed that the shares in question were treasury shares after they were reacquired by SCHC.
Appellants cite § 234 of the Constitution of Alabama (1901) and Code 1975, § 10-2A-36, as authority for their assertion that treasury shares can not be purchased with a promissory note. Section 234 of the Alabama Constitution states: "No corporation shall issue stocks or bonds except for money, labor done, or property actually received." Similarly, Code, § 10-2A-36, states the same basic rule in more detail:
"(a) The consideration for the issuance of shares may be paid, in whole or in part, in money, in other property, tangible or intangible, or in labor or services actually performed for the corporation. When payment of the consideration for which shares are to be issued shall have been received by the corporation, such shares shall be deemed to be fully paid and nonassessable.
"(b) Neither promissory notes nor future services shall constitute payment or part payment for the issuance of shares of a corporation.
"(c) In the absence of fraud in the transaction, the judgment of the board of directors or the shareholders, as the case may be, as to the value of the consideration received for the shares shall be conclusive."
These constitutional and statutory sections are based on a longstanding public policy of this State to prohibit the sale of watered or worthless stock to the public. The rationale for placing prohibitions on when a corporation can issue stock was discussed by the Court over a century ago:
"The constitution, in terms, inhibits the issue of fictitious stock; that is, stock which has no valuable thing, or corporate assets, to rest on, and of which it is the representative. If it represents nothing, and has nothing to stand on, it is fictitious, it is fraudulent, it is unconstitutional."
Fitzpatrick v. Dispatch Publishing Co., 83 Ala. 604, 2 So. 727 (1887); see Holloway v. Osteograf Co., 240 Ala. 507, 200 So. 197 (1941); see, also, Slupsky v. Westinghouse Electric & Mfg. Co., 78 F.2d 13, 17 (8th Cir.1935). These constitutional and statutory provisions were also intended to ensure that the stated capital account of a corporation is in fact an accurate reflection of the amount of money actually contributed. Because the sale of treasury stock does not affect the stated capital account of a corporation, the protections afforded by these sections should not, and were never intended to, apply to a resale of stock that has already been purchased for adequate consideration.
"Treasury shares have no effect on stated capital unless and until they are cancelled or retired, in which event stated capital is reduced by the amount then representing the shares. Treasury shares must be distinguished from authorized but unissued shares in several respects: their acquisition does not reduce the number of issued shares or the amount of stated capital and their sale does not increase the number of issued shares or the amount of stated capital."
11 Fletcher, § 5088 at 38.
This analysis is further supported by the fact that § 10-2A-36 is identical to § 19 of the Model Business Corporation Act. See Commentary to Code, § 10-2A-36. The Alabama Business Corporation Act is based on the Model Business Corporation Act. See Commentary to Code, § 10-2A-1. The comments to M.B.C.A., § 19, state:
"In 1969 the second paragraph [dealing with the use of promissory notes to purchase stock] was amended to make it clear that the prohibition [against using promissory notes] was directed solely to payment upon original issuance and not to subsequent sales of shares." (Emphasis added.)
Model Business Corporation Act Annotated (2d ed. 1971) at 436.
*419 The proper construction of § 234 of the Constitution of Alabama of 1901 and Code 1975, § 10-2A-36, is that the legislature intended that they apply only to the issuance of stock, and not to the sale of treasury stock. As both sides to this appeal agree, the Alabama case most analogous to the present one is Mudd v. Lanier, 247 Ala. 363, 24 So.2d 550 (1945). The relevant portion of Mudd states:
"Section 234 of the Constitution prohibits the issuance of stock except for the consideration named. That includes all its capital stock as and when it is originally issued. Unissued stock can be disposed of by the corporation only on the basis of the requirements of section 234 of the Constitution and section 26, Title 10, Code [1940]. [Citations omitted.] After it has been issued for a proper consideration and reacquired by the corporation, otherwise than by a redemption, it is an asset in its treasury to be bargained and sold as every other asset. 18 C.J.S. Corporations, § 212, p. 245. But it should not be issued, or otherwise disposed of, as an original issue, except for the kind and amount of consideration named in the Constitution and statute."
Mudd, 247 Ala. at 379, 24 So.2d at 564-65.
The prohibitions against the use of promissory notes to buy stock, then, apply only to the original issuance of stock, not to the sale of treasury stock. Thus, the promissory note given by Old Towne was adequate consideration for the purchase of the treasury stock.
Several cases from other jurisdictions, as well as legal commentators, have dealt specifically with the issue before this Court and have concluded that statutory or constitutional provisions against the use of promissory notes to purchase stock do not apply when the shares purchased are treasury shares. We approve the following language recently used to discuss the purchase of treasury stock:
"In the disposition of treasury stock the corporation is not controlled by the provisions of the constitution, statute, or charter regulating the amount of consideration for which stock of an original issue must be sold."
Corp. Guide (P-H) ¶ 2133, at 2129 (Jan. 28, 1986).
This reasoning is supported by some of the earliest legal scholars who discussed the sale of treasury stock:
"In such case it is abundantly established that the corporation or such trustee may sell and dispose of such [treasury] stock at less than its par value, without ... violating constitutional or statutory provisions regulating the issue of stock ..."
4 Thompson, Commentaries on the Law of Private Corporations, § 3436 at 53 (1909).
As previously noted, several courts have also concluded that a corporation can accept a promissory note as payment for treasury stock. In discussing statutory prohibitions similar to the ones in Alabama, the Missouri Court of Appeals held:
"Our statute provides that no note shall be considered as payment of any part of the corporate stock. Section 10155, R.S. 1919. This has reference to stock issued in the first instance. After the corporation has once issued its stock, and the subscriber has paid therefor, the statute is satisfied. A corporation may sell its treasury stock for cash or credit, for par or for market value, or upon any terms that a shareholder could sell [upon]."
Bondurant v. Raven Coal Co., 25 S.W.2d 566, 575 (Mo.App.1929).[2]
*420 After a thorough examination of this issue, we hold that a promissory note can be given as consideration for the purchase of treasury shares of a corporation. In so holding, we must caution that in some situations, although this is not one of them, parties may attempt to circumvent the provisions of § 234 of the Constitution and of Code 1975, § 10-2A-36, by purchasing stock for proper consideration, immediately reselling it to the corporation, and then repurchasing it for promissory notes. Such actions, or those similar, are not always made valid by a superficial compliance with the provisions of the law. In questionable cases, a court, when the issue is properly presented, should examine the underlying transactions to determine if they were made in good faith or were merely sham transactions designed to thwart the protections afforded by the Constitution and the Code. Such an examination is particularly appropriate in cases involving closely held corporations.

II. The Terms of the Promissory Note
The sole question raised about the promissory note is whether it is a "demand" note or is to be paid according to the terms of the May 20 agreement. The only language in the note concerning a time for payment states that it is "payable when debt is due." Appellants argue that this does not give a time for payment, and, therefore, that under Code 1975, § 7-3-108, it is a "demand" note. The appellees contend that the note is to be paid out of the stock dividends as provided for in the agreement signed May 20. The trial judge agreed with the appellees and ruled that the note was to be paid only out of the dividends declared on the 30,650 shares of stock. The trial judge's ruling gave effect to the provisions of the May 20 agreement and incorporated these terms into the promissory note:
"After considering the evidence offered during the hearing, and reconciling the language of the exhibits, particularly the aforesaid agreement and promissory note, the Court finds that the $140,000 is to be paid from the dividends accrued on the stock. Thus, the underlying payment is to be made from the dividends.
"It is therefore ORDERED, ADJUDGED and DECREED that since no payments have been declared to pay the note, the plaintiff must be allowed to vote at the shareholders' meeting on July 15, 1988."
Although he did not specifically so state in his ruling, the trial judge obviously determined that the provision in the note concerning time of payment was ambiguous and that this ambiguity should be explained by using general contract law, without resorting to the provisions of the Uniform Commercial Code as enacted in Alabama. We agree with the trial judge's determination on this point.
Because the present case is one between the original parties to the promissory note, as opposed to a case between the maker and an innocent third party, we will look to general contract law to ascertain the meaning of any ambiguous terms used in the note. As Anderson notes in his multi-volume series on the Uniform Commercial Code:
"When the question is merely the rights and liabilities of the original parties who have dealt directly with each other, or through authorized agents, it is not significant whether paper is negotiable as the transaction will be governed by ordinary principles of contract law." *421 5 R. Anderson, Anderson on the Uniform Commercial Code, § 3-101:18 at 151 (1984).
Under contract law, any ambiguous terms in a writing may be explained through reference to other agreements that are part of the same transaction:
"The controlling general principle of law is that two writings connected by reference one to the other, or made with respect to the same subject matter and proved to be parts of an entire transaction, constitute but a single contract as if embodied in one instrument. Moorer v. Tensaw Land & Timber Co., 246 Ala. 223, 20 So.2d 105 (1944), and cases there cited."
Task Consultants, Inc. v. Finerty, 339 So.2d 87, 89 (Ala.Civ.App.1976).
The trial judge ruled that the May 20 agreement and the promissory note were part of a single transaction and therefore should be read together to explain the ambiguous term of the promissory note. After examining the evidence presented at trial, we conclude that the trial judge was correct in so ruling. Therefore, we affirm the trial court's ruling on this point and hold that the promissory note is to be paid out of the dividends paid on the 30,650 shares of stock, as provided for in the May 20 agreement.

III. The Propriety of Injunctive Relief
Having determined that the promissory note was adequate consideration for the purchase of treasury shares, we further hold that injunctive relief was available to protect the voting rights of the shareholder. While the trial judge did not specifically enjoin any actions, his ruling nonetheless had the effect of awarding the relief that Old Towne and Horn had prayed for. We affirm that portion of the judgment.
A three-pronged test is used by a trial court to review an application for a preliminary injunction.
"1) `A trial judge does not have to find that the party seeking a preliminary injunction would certainly prevail on the merits in order to grant the injunction. Rather, if he finds that the party has presented a fair question as to the existence of the right to be protected, and further finds that temporary interference to preserve the status quo is convenient and expedient, then he may exercise his discretion and grant the injunction.' Alabama Ed. Ass'n v. Bd. of Trustees, 374 So.2d 258, 262 (Ala.1979).
"2) `... An injunction should not be granted unless it is necessary to prevent irreparable injury.' First City National Bank of Oxford v. Whitmore, 339 So.2d 1010, 1011 (Ala.1976).
"3) `Injunctions, however, will not be granted "... merely to allay apprehension of injury; the injury must be both imminent and irreparable in a court of law ..." Cullman Property Co. v. H.H. Hitt Lumber Co., 201 Ala. 150, 153, 77 So. 574, 577 (1917).' Watts v. Victory, 333 So.2d 560, 563 (Ala.1976)."
Double C. Productions, Inc. v. Exposition Enterprises, Inc., 404 So.2d 52, 54 (Ala. 1981).
The standard for reviewing a ruling on a preliminary injunction request was recently restated by the Court:
"A party appealing from the grant or denial of a motion for a preliminary injunction also bears a heavy burden because a trial court's decision to grant or deny a motion seeking a preliminary injunction will not be disturbed on appeal, absent a gross abuse of discretion. [Citations omitted.] His abuse of discretion must be such as to result in manifest injustice unless this Court sets aside the trial court's order."
Adams v. Farlow, 516 So.2d 528, 537 (Ala. 1987).
Having examined the record, we hold that the appellants have failed to show any abuse of discretion; we, therefore, affirm the trial judge's injunctive order. Injunctive relief has long been available to prevent the transfer of shares of stock. Oden v. King, 216 Ala. 504, 113 So. 609 (1927). The power of a court to enjoin a party from voting stock in violation of a statute has also been recognized. See Mack v. DeBardelaben Coal & Iron Co., 90 Ala. 396, 8 So. *422 150 (1889). The court's granting of such relief to protect the voting interests of a shareholder is simply another application of this principle.
Courts in other jurisdictions have granted injunctive relief to protect the voting rights of shareholders. See Schwadel v. Uchitel, 455 So.2d 401, 403 (Fla.Dist.Ct. App.1984) ("[t]he general rule is that a court of equity is empowered to issue injunctive relief to prevent officers or directors of a corporation from wrongfully dealing with corporate assets and to prevent such wrongful actions from infringing upon shareholders' voting rights"); see, also, Salgo v. Matthews, 497 S.W.2d 620, 629 (Tex.Civ.App.1973) (injunction and mandamus are available to protect interests of beneficial owners of stock). Having determined that the promissory note was adequate consideration for the purchase of the stock, it would be inconsistent for this Court not to grant injunctive relief to protect the right to vote this stock.
"Speaking generally, the right to vote is a right which is inherent in and incidental to the ownership of corporate stock, and as such is a property right."
5 W. Fletcher, § 2025 at 116.

IV. Conclusion
The trial court in the present case correctly held that a promissory note can be used to purchase treasury stock; that the note in this case was not a "demand" note; and that injunctive relief was appropriate to protect the voting rights of the plaintiff shareholder. We find the other points raised in this appeal to be without merit. The judgment, therefore, is affirmed.
AFFIRMED.
HORNSBY, C.J., and ALMON, SHORES, ADAMS, HOUSTON and STEAGALL, JJ., concur.
MADDOX, J., concurs in part and dissents in part.
KENNEDY, J., recuses.
MADDOX, Justice (concurring in part, and dissenting in part).
I concur with the majority opinion in its holdings that a promissory note can be consideration for the purchase of treasury stock and that injunctive relief was appropriate to protect the voting rights of the shareholder. However, I must respectfully dissent from the holding that the promissory note in this case was not a demand note.
A "negotiable instrument" is defined in Ala.Code 1975, § 7-3-104, as follows:
"(1) Any writing to be a negotiable instrument within this article must:
"(a) Be signed by the maker or drawer; and
"(b) Contain an unconditional promise or order to pay a sum certain in money and no other promise, order, obligation or power given by the maker or drawer except as authorized by this article; and
"(c) Be payable on demand or at a definite time; and
"(d) Be payable to order or to bearer." (Emphasis added.)
The note in this case was signed by Horn, as president of Old Towne; it contained a promise to pay $140,000 and no other promise, and it was payable to the order of SCHC. Thus, the only question was whether it was payable on demand or at a definite time.
As the appellants correctly point out in their brief, "Negotiability is determined from the face, the four-corners, of the instrument without reference to extrinsic facts." Holsonback v. First State Bank of Albertville, 394 So.2d 381, 383 (Ala.Civ. App.1980), cert. denied, 394 So.2d 384 (Ala. 1981). Therefore, to be a negotiable instrument, this note must state on its face that it is a demand note or that it is payable at a definite time.
The definition of "on demand" is contained in § 7-3-108: "Instruments payable on demand include those payable at sight or on presentation and those in which no time for payment is stated." Section 7-3-109 defines "payable at a definite time":
"(1) An instrument is payable at a definite time if by its terms it is payable:

*423 "(a) On or before a stated date or at a fixed period after a stated date; or
"(b) At a fixed period after sight; or
"(c) At a definite time subject to any acceleration; or
"(d) At a definite time subject to extension at the option of the holder, or to extension to a further definite time at the option of the maker or acceptor or automatically upon a specified act or event.
"(2) An instrument which by its terms is otherwise payable only upon an act or event uncertain as to time of occurrence is not payable at a definite time even though the act or event has occurred." (Emphasis added.)
The only language in the note in question concerning time of payment states that it is "payable when debt is due." Appellants argue that this statement does not give a time for payment, and, therefore, that under § 7-3-108 it is a demand note. The trial judge was not persuaded by this argument, and he ruled that the note was not payable on demand:
"After considering the evidence offered during the hearing, and reconciling the language of the exhibits, particularly the aforesaid agreement and promissory note, the Court finds that the $140,000 is to be paid from the dividends accrued on the stock. Thus, the underlying payment is to be made from the dividends.
"It is therefore ORDERED, ADJUDGED and DECREED that since no dividends have been declared to pay the note, the plaintiff must be allowed to vote at the shareholders' meeting on July 15, 1988."
Although he did not specifically so state in his ruling, the trial judge obviously determined that the note was not payable on demand. I think that the trial judge erred in this determination.
I am aware of no Alabama case that has discussed the situation presented in this case, where the time for payment on a promissory note is uncertain from the face of the note. If the time for payment were absent, then unquestionably, this would be a demand note. See Nall v. Bland Lumber Co., 35 Ala.App. 503, 49 So.2d 228 (1950) (applying pre-UCC law). The exact problem of when the time for payment is uncertain from the face of the note is discussed in Anderson's multi-volume series on the Uniform Commercial Code:
"By the pre-Code law it was held that uncertainty of the due date of an instrument destroyed negotiability, although it did not impair the contract as between the parties.
"Should this situation arise under the Code, the uncertain due date paper should be treated as paper `in which no time for payment is stated.' If so regarded, the paper is then payable on demand, and its negotiability is not affected."
5 R. Anderson, Anderson on the Uniform Commercial Code, § 3-108.7 at 260 (1984).
I think that the reasoning of the majority is based upon pre-Code law relating to negotiable instruments. I believe this instrument must be construed in accordance with Article 3 of the UCC.
While I have no disagreement with the proposition of law cited by the majority that contract law governs when the question is merely the rights and liabilities of the original parties, that proposition is not applicable to this case. This is not a simple case of two parties dealing directly with each other. SCHC was the named payee of the note, yet SCHC was not a party to the agreement that provided for the sale of the treasury stock to Horn and Old Towne in return for the note. Further, Farmers and Merchants Bank was involved in the sale of this stock to SCHC so that SCHC could sell it to Horn and Old Towne, as the agreement in question required. Also, the circuit court and the bankruptcy court were involved in the disposition of this stock. In light of the complex nature of the various parties' involvement in this whole transaction and the fact that the payee of the note was not a party to the May 20 agreement, I believe that the question of this note's negotiability is critical. Thus, the UCC, and not general contract law, should govern our analysis of whether this was a demand note.
*424 The note from Old Towne to SCHC had an uncertain due date. Since negotiability is determined from the face of the instrument and not from extrinsic facts, it seems to me that the term "payable when debt is due" is anything but a "definite time" as the statutes require. I would hold that this note was a demand note, and I would reverse that portion of the judgment to the contrary.
NOTES
[1] Because Horn owns and controls Old Towne, there is no reason to distinguish between the rights or liabilities of the two parties.
[2] For a partial list of authorities, see Borg v. International Silver Co., 11 F.2d 147, 150 (2d Cir.1925) (a treasury share "may be resold for what it will fetch on the market"); Enright v. Heckscher, 240 F. 863, 874 (2d Cir.1917) ("stock so turned in is known as treasury stock, and the cases hold that a corporation may sell such stock at the best price that can be obtained for it"); Simonds v. Noland, 142 Wash. 423, 253 P. 638, 639 (1927) ("[w]hen stock, subscribed and fully paid for, is turned back to the corporation, it occupies no different position than any other asset of the corporation which the company has power to sell; and regarding such sale it can make such agreements as the dictates of sound business judgment may demand"); Furlong v. Johnston, 239 N.Y. 141, 145 N.E. 910 (1924) ("[i]f the note was given in connection with a purchase of corporate stock previously issued, then the note, from the time it was signed, was free from any infirmity, and was enforceable even in the hands of the original payee; if it was given in connection with a subscription for new stock, then the defendant and the corporation have failed to comply with the provisions of Stock Corporation Law (Cons.Laws, c. 59), formerly sections 53 and 55, governing subscriptions to stock, and the consideration for its issue"). See, also, Ogden v. Culpepper, 474 So.2d 1346, 1351 (La.Ct.App.1985) ("[s]ince treasury shares are already issued shares, having been subsequently acquired but not cancelled by the corporation (LSA-R.S. 12:1[X]), and since shares are restored to the status of unissued shares by being cancelled (LSA-R.S. 12:55[G]), one may argue that the sale of treasury stock is not an `issuance' of stock within the meaning of 12:52(C)"). But see Public Investment Ltd. v. Bandeirante Corp., 740 F.2d 1222, 1232-33 (D.C.Cir.1984) (the anti-fraud purposes of the D.C. statute prohibiting the issuance of stock in exchange for a promissory note apply equally to the sale of treasury shares).