KENNEDY, Justice.
Rene A. Stiegler, a stockholder in American Mobilphone Paging, Inc.,[1] sued in the Mobile Circuit Court for a judgment declaring that, pursuant to a stock purchase agreement, he had a right to first refuse an offer for the sale of stock held in the corporation by Bernard S. Dittman. Stie-gler applied for a temporary restraining order and a preliminary injunction to prevent Dittman from selling his shares of stock to Vencor, Inc. The trial court consolidated the preliminary injunction hearing and the trial on the merits of the case. After a hearing on the merits, the trial court entered a judgment holding that Stie-gler had a right of first refusal, but that Vencor’s negotiations with Dittman did not constitute a bona fide stock purchase offer that Dittman was willing to accept. Stie-gler appeals from that part of the judgment holding that Vencor had not made a bona fide offer. Dittman cross-appeals from that part of the judgment holding that Stiegler has a right to first refuse an offer for sale of stock American Mobil-phone Paging, Inc.
Bernard Dittman formed American Mo-bilphone Paging, Inc. (“AMPI”), in 1982. AMPI is a radio common carrier in the business of providing paging and mobile telephone service in the Mobile, Alabama, area. In 1983, Dittman executed an agreement by which he sold 1,000 shares of a total of 2,000 shares of the then issued *509 capital stock in the corporation to American Mobilphone of Alabama, Inc. (“Mobil-phone”), a corporation doing business in Birmingham, Alabama. The sale was evidenced by an agreement entitled “Agreement for Purchase of [AMPI] Stock and Promissory Note” (“the Mobilphone Agreement”). In 1984, AMPI issued a stock certificate denoting 500 shares of capital stock to Rene Stiegler, giving him ownership of 20% of the corporation’s stock. The sale was evidenced by an agreement entitled “Agreement of [AMPI] for Rene A. Stie-gler, III, to Own 20% of its Voting Capital Stock” (the “Stiegler Agreement”).[2]
In 1989, Dittman entered into negotiations with Vencor, Inc., which resulted in the execution of a written agreement for Dittman to sell a portion of his stock to Vencor. Dittman notified Stiegler of the result of the negotiations with Vencor, and, although he denied that Stiegler had a right to first refuse the offer for sale of the stock, he offered to sell the stock to Stiegler under the conditions set forth in the agreement between Dittman and Ven-cor. Stiegler replied that he did not believe that the agreement between Dittman and Vencor constituted a bona fide offer, but that, if it was determined to be a bona fide offer, he would exercise his right of first refusal. In response, Dittman stated that the Vencor offer was bona fide and that he interpreted Stiegler’s letter to be a refusal of his right to match Vencor’s alleged “offer.” Thereafter, Stiegler instituted this action. Because a negative resolution of the issue raised in Dittman’s cross-appeal would be dispositive, we address that issue first.
I.
Dittman argues that the trial court erroneously held that Stiegler had a right to first refuse the offer for the sale of Ditt-man’s stock in AMPI. He argues that a reading of the Mobilphone Agreement along with the Stiegler Agreement and the stock certificates issued to both Mobil-phone and Stiegler indicates that Stiegler does not have a right of first refusal. Stie-gler argues that his right of first refusal derives from the language of the Mobil-phone Agreement and that this Court should look no further than that document to determine whether he has such a right. Both Dittman and Stiegler contended at trial that the relevant documents are not ambiguous. In its final judgment, the trial court — holding that Stiegler has a right of first refusal — stated that its decision was based on the pertinent provisions of the Mobilphone Agreement. Thus, it appears that the trial court held, as a matter of law, that the Mobilphone Agreement was unambiguous and that it provided Stiegler with a right of first refusal.
The Mobilphone Agreement is dated April 9, 1983.[3] It provides in pertinent part:
“IX. Right of First Refusal on Sale of Stock
“9.1 For purposes of this Article IX hereof, [Mobilphone] and [Dittman] and any other person or party who at any time is authorized to hold capital stock of the [AMPI], shall be referred to collectively as the ‘Shareholders’ and individually as a ‘Shareholder.’ In the event a Shareholder desires to sell, transfer, assign or otherwise dispose of any of the capital stock in the [AMPI] then owned by such Shareholder for any purpose (other than to secure an obligation which is prohibited under Section 8.1 hereof), such Shareholder shall first obtain prior written consent therefor from all of the other Shareholders, or in the absence of such consent, must, [upon receipt of a bona fide written offer for purchase,] offer such stock for sale [to the nonsell-ing shareholders at the same price and under the same conditions].
[[Image here]]
“9.6 Before any of the capital stock of [AMPI], whether now or hereafter is *510 sued, can be issued or transferred on its books and records to any person, party or transferee whomsoever, whether an authorized purchaser or assignee hereunder, executor, administrator, guardian or devisee, such person or party to whom it is issued or such transferee must agree in writing to all of the terms and conditions of this Article IX and of Article VIII hereof....
[[Image here]]
“XII. Fulfillment of Conditions
“The obligations of [Mobilphone] hereunder are subject to the satisfaction, on or prior to closing, of each of the following conditions (any of which may only be waived in whole or in part in writing by [Mobilphone] at or prior to closing):
[[Image here]]
“12.5 [AMPI] shall have employed Rene Stiegler, whose employment ... will commence no later than the closing date, under a written employment agreement containing terms and conditions of his employment ... which are fully acceptable and satisfactory to [Mobil-phone], and any agreement with Rene Stiegler for the acquisition of capital stock in [AMPI] shall be fully acceptable and satisfactory to [Mobilphone].”
(Emphasis added.)
The stock certificate evidencing the sale of stock to Mobilphone states:
“This certificate subject to agreement between Bernard S. Dittman and [Mobil-phone] dated April 9, 1983.”
The stock certificate is dated January 20, 1984.
The Stiegler Agreement, which is also dated January 20, 1984, provides in pertinent part:
“Whereas, AMPI is an Alabama corporation with only one class of voting capital stock consisting of 2,000 shares having par value of $10.00 per share; and
[[Image here]]
“Whereas, [Dittman] is the owner of 2,000 of said shares and AMPI is issuing to [Stiegler] simultaneously herewith 500 shares of its stock of which [Stiegler] shall be the holder and owner, but subject to the restrictions herein; and
[[Image here]]
“Whereas, [Mobilphone], [Dittman] and [AMPI] have reached an agreement whereby [Mobilphone] will acquire certain of [Dittman’s] presently existing stock in [AMPI];
[[Image here]]
“It is, therefore, agreed as follows:
“1. For value received, [AMPI] herewith issues to [Stiegler] and [Stiegler] herewith acknowledges receipt of stock certificate no. 4 of [AMPI] evidencing 500 shares of fully paid voting capital stock of [AMPI], representing 20% of its capital stock free and clear of liens and encumbrances except as to the restrictions described herein.
[[Image here]]
“2. [Stiegler] has simultaneously herewith signed an employment agreement with [AMPI] which among other things, obliges him to be in the employ of AMPI for a term ending September 30, 1986. This Agreement and the stock issued to him pursuant hereto comprise material inducements to the entering into said employment agreement by [Stie-gler]. [Mobilphone] represents and warrants that it has simultaneously herewith entered into an agreement to acquire a portion of Dittman’s stock in [AMPI].
[[Image here]]
“6. If [Stiegler] desires to sell or transfer ownership of any of his vested non-forfeitable stock in [AMPI] he must first obtain the consent of all other shareholders of [AMPI] or in the absence of such consent, [upon receipt of a bona fide written offer for purchase,] offer such stock for sale [to the nonselling shareholders at the same price and under the same conditions].
[[Image here]]
“10. Should [Mobilphone] and [Ditt-man] or either of them at any time sell or transfer any of their stock in [AMPI] to any person or entity other than [Ditt-man], [Stiegler], [Mobilphone] or [AMPI], then: (a) all of [Stiegler’s] shares shall be deemed vested and nonforfeitable; and (b) no such transfer shall be effec *511 tive unless the transferee agrees to become obliged to the terms and provisions hereof to the same extent as the trans-feror of said shares.
[[Image here]]
“14. This Agreement contains the entire agreement between the parties hereto relating to the matters provided herein, and no representation or warranty not expressly contained or incorporated by reference herein shall be binding on any party hereto. This Agreement shall not be modified or amended in any manner except by an instrument in writing executed by the parties or their respective successors in interest.”
(Emphasis added.)
The stock certificate evidencing the sale of stock to Stiegler states:
“This certificate subject to employment agreement of Rene A. Stiegler III with [AMPI] dated January 21, 1984, and with agreement of AMPI for Rene A. Stiegler III to own 20% of its voting capital stock dated January 21, 1984.”
The stock certificate is also dated January 20, 1984.
Whether a contract is ambiguous is a question of law for a trial court to determine. Kirkland & Co. of Anniston, P.C. v. A & M Food Service, Inc., 579 So.2d 1278 (Ala. 1991); Cherokee Farms, Inc. v. Fireman’s Fund Insurance Co., 526 So.2d 871 (Ala.1988); P & S Business, Inc. v. South Central Bell Telephone Co., 466 So.2d 928 (Ala.1985). Only if the contract is found to be ambiguous will the issue of its meaning be sent to the jury for its determination. Kirkland & Co., supra; Elder v. E.I. DuPont De Nemours & Co., 479 So.2d 1243 (Ala.1985). This threshold question — whether a contract is ambiguous — is a question of law. Cherokee Farms, Inc., supra; Brown Mechanical Contractors, Inc. v. Centennial Insurance Co., 431 So.2d 932 (Ala.1983).
In deciding whether to consider all of the documents excerpted above in determining whether Stiegler has a right of first refusal, we recognize the following principle of law, although neither party cites it in its brief.
“Under contract law, any ambiguous terms in writing may be explained through reference to other agreements that are part of the same transaction:
“ ‘The controlling general principle of law is that two writings connected by reference one to the other, or made with respect to the same subject matter and proved to be parts of an entire transaction, constitute but a single contract as if embodied in one instrument. Moorer v. Tensaw Land & Timber Co., 246 Ala. 223, 20 So.2d 105 (1944), and cases there cited.’
Task Consultants, Inc. v. Finerty, 339 So.2d 87, 89 (Ala.Civ.App.1976).”
Brumfield v. Horn, 547 So.2d 415, 421 (Ala.1989).
The Mobilphone Agreement, which provides a right of first refusal to Dittman and Mobilphone and “any other person or party who at any time is authorized to hold capital stock,” refers to the Stiegler Agreement. It does so by requiring that, prior to the closing between Dittman and Mobil-phone, AMPI shall have employed Stiegler under terms acceptable to Mobilphone and that any stock purchase agreement with Stiegler must also be acceptable to Mobil-phone. The Mobilphone Agreement also provides that, before any capital stock in AMPI can be issued, the party to whom the stock is issued must agree in writing to the terms of the Mobilphone Agreement providing for a right of first refusal, and that that agreement must be noted on that party’s stock certificate.
In turn, the Stiegler Agreement states that, Dittman, Mobilphone, and AMPI having agreed that Mobilphone will acquire certain of Dittman’s stock in AMPI, AMPI simultaneously issues certain stock to Stie-gler and executes an employment agreement with Stiegler. However, the Stiegler Agreement then provides that it contains the entire agreement between the parties relating to the matters provided for therein.
Based on the cross-references in the Mobilphone and Stiegler Agreements, not *512 withstanding the limitation in the Stiegler Agreement, we hold that the agreements should properly be read together to determine whether Stiegler has a right of first refusal. Thus, we must now determine whether the documents, read together, unambiguously state that Stiegler does or does not have a right of first refusal. Neither Dittman nor Stiegler argues that the documents are not ambiguous.
The Mobilphone Agreement provides any future stockholder with a right of first refusal. However, it provides that future stockholders must agree in writing to the terms of the right-of-first-refusal clause. Nonetheless, this requirement seems to be intended to ensure only that future shareholders of AMPI stock be aware of and honor Dittman and Mobil-phone’s rights of first refusal before they sell their stock. The Stiegler Agreement provides that, if Stiegler wishes to sell his stock in AMPI, he must first offer a right of first refusal to all stockholders. That Agreement also contains a right of first refusal for Stiegler; however, the language providing Stiegler with that right, although it is legible, has been marked through.
Dittman argues that the fact that the language in the Stiegler Agreement providing Stiegler with a right of first refusal was stricken indicates that the parties intended not to give Stiegler such a right. Stiegler counters by saying that the absence of specific language in the Stiegler Agreement conflicting with the language in the Mobilphone Agreement providing him a right of first refusal suggests that Stiegler has a right of first refusal under the Mobil-phone Agreement. We hold that the documents, construed together, do not unambiguously state whether Stiegler has a right of first refusal. That is, we can not say, as a matter of law, that Stiegler has a right of first refusal or does not have a right of first refusal. Although the trial court heard oral testimony concerning this issue, its order indicates that its decision was based on its finding, as a matter of law, that the Mobilphone Agreement unambiguously granted Stiegler a right of first refusal. Having held that the language of the Mobilphone Agreement and the language of the Stiegler Agreement do not unambiguously provide Stiegler with a right of first refusal, we conclude that the issue should be submitted to the finder of fact for its determination.
II.
Although we reverse that part of the trial court’s judgment stating that Stiegler has a right of first refusal and remand the cause to that court for a factual determination of that issue, and we realize that a factual finding that Stiegler does not have a right of first refusal would render moot our decision on the issue raised by Stiegler, we nevertheless address that issue.
Stiegler argues that the trial court erred in holding that Vencor’s offer was not a “bona fide written offer,” as contemplated by the Mobilphone Agreement. Although the Mobilphone Agreement requires that there be a bona fide written offer to invoke a right of first refusal, both Stiegler’s and Dittman’s arguments on appeal, and the trial court’s order, indicate that the actual issue was whether there was an offer that Dittman would have accepted. Thus, this Court will treat the issue accordingly.
Viewing the trial court’s order with the attendant presumption of correctness, we find that the testimony, as shown by the transcript of the evidence, reveals the following:
Dittman entered into negotiations with Vencor to sell a portion of his stock. The first written proposal to purchase Ditt-man’s stock, a “Letter of Intention to Purchase,” was sent to Dittman by Vencor on February 21, 1989. In that letter, Vencor proposed to purchase 75% of Dittman’s stock in AMPI.[4] Dittman agreed to the following concerning AMPI’s assets:
“[T]hat there shall be at least 5,664 paging customers and 100 two-way radio *513 customers who are not more than 30 days in arrears in their payments to the company. In the event that there are less than the above number of customers, then the purchase price shall be reduced by $1,000.00 for each customer short.”
(Emphasis added.)
Bernard Malkove, who negotiated to sell Dittman’s stock, testified that after February 21, 1989, he had numerous conversations and meetings with Vencor representatives regarding the sale of the stock.
On March 6, 1989, Vencor sent a “Revised Letter of Intent” to Malkove in which Vencor incorporated revisions requested by Dittman’s attorney, Maury Friedlander. The provision in the revised letter concerning the number of pagers in operation is identical to the corresponding provision in the February 21, 1989, letter save that the $1,000 figure was reduced to $725.
On March 8, 1989, Friedlander sent an “Agreement to Purchase and Sell Stock” to Vencor on behalf of Dittman. In his accompanying letter of transmittal, Friedlan-der stated that he had revised some of the provisions contained in previous versions of the proposed “agreement.” There was no significant amendment to the language concerning the method of determining the number of customers with accounts in arrears.
The final written agreement between Dittman and Vencor, again entitled “Agreement to Purchase and Sell Stock” (hereinafter referred to as the “Vencor Agreement”), is dated April 13,1989. That agreement provided in pertinent part:
“This document constitutes an offer by Vencor, Inc., or an associated entity through assignment (Buyer), and an acceptance to sell by Bernard Dittman (Seller) of Seventy Percent (70%) of the issued and outstanding stock of [AMPI]_[5] The terms of this Agreement will be incorporated in and .be subject to the signing of a detailed formal, definitive agreement acceptable to both parties and containing standard representations, warranties, indemnification and other provisions customary in such agreements, including but not limited to the following:
[[Image here]]
“The Seller represents that Twenty Percent (20%) of the issued and outstanding stock of [AMPI] is in the name of Rene Stiegler, an individual. The Buyer has been apprised of the fact that Mr. Stiegler has notified the Seller that Mr. Stiegler believes that he has a right of first refusal with respect to the purchase of the Seller’s stock. The Seller is of the opinion that Mr. Stiegler’s claim for a first right of refusal lacks merit. However, based upon the foregoing, the parties hereto have agreed that the Seller shall submit a copy of this offer to Mr. Stiegler giving him his right of first refusal, and that for a period of forty-five (45) days subsequent thereto Mr. Stiegler shall have his right of first refusal, and if he exercises the same, this Agreement shall be null and void and of no further force or effect. However, in the event that he fails to exercise the same, this Agreement shall be binding. At such time the parties will enter into a more definitive written agreement, and complete the formal due diligence.
[[Image here]]
“The Seller warrants that at the time of closing there shall be at least 5,465 pagers and 100 two-way radios in operation producing revenue from customers, which include_pagers and radios that are on a barter basis. In the event that there are less than the above numbered pagers and two-way radios in operation producing revenue from customers, then the purchase price shall be reduced $725 for each unit short.
[[Image here]]
“In entering into this Agreement, the Buyer has agreed to:
“Pay the Seller One Million Two Hundred Fifty Thousand Dollars ($1,250,000.00) at closing. The balance of Two Hundred Thousand Dollars *514 ($200,000.00) is to be placed in escrow with interest and paid to the Seller, with the interest thereon, One Hundred Thousand Dollars ($100,000.00) principal plus interest ninety (90) days after closing and One Hundred Thousand Dollars ($100,000.00) One Hundred Eighty (180) days after closing, provided that no claims have been made by the Buyer, or third parties, under warranties, indemnifications, and other material representations set forth in the definitive agreement.
“Proceed in an expeditious manner so that closing can take place as soon as possible. On or before April 25, 1989, the Buyer’s representatives will prepare a draft of the definitive agreement with proposed schedules to be prepared by each of the parties. Seller will then have two weeks from the receipt of the draft agreement to propose changes thereto. Buyer and Seller will then make every effort to reach a definitive agreement by May 26, 1989. In the event a mutually acceptable agreement has not been completed by May 26, 1989, an extension of time to complete the agreement can be granted by the mutual consent of both Buyer and Seller. ”
(Emphasis added.)
The Vencor Agreement was signed by Ditt-man and a representative of Vencor.
On April 14, 1989, Dittman sent Stiegler a copy of the executed Vencor Agreement, along with the following letter attached:
“We have had various discussions, and our attorneys have had various discussions, concerning an alleged right of first refusal on sale of [AMPI] stock. You have contended that you have such a right of first refusal in the event I should sell all or any portion of my stock, and I have consistently denied the same.
“However, attached you will find a copy of an offer for a portion of my stock in AMPI. The offeror is Vencor, Inc. ... Pursuant to the agreement which you contend exists at this time, I enclose herewith by certified United States mail this notice offering all of such stock for purchase by you at the price and on the terms and conditions set forth in the enclosed written offer, which is a bona fide offer. You will note that the full name and address of the proposed purchaser is set forth therein, and you should elect to purchase or not to purchase within forty-five (45) days after the date of mailing of this document to you, as indicated above.
“In the event that you should not elect to purchase the stock, and you determine this in advance, I would appreciate it if you would waive any rights that you have so I can go about closing the sale for stock as indicated in the attached offer.”
Thereafter, Stiegler became concerned that the term “pager” in the Vencor Agreement was not adequately defined in order to determine how many pagers AMPI would have in operation when and if he decided to use his disputed right of first refusal.[6] As stated above, the Vencor Agreement provides only that, in the event that there are fewer than the agreed number of pagers in operation at the time of closing, the purchase price shall be reduced $725 for each subtracted unit. Absent from the Vencor Agreement provision is a definition of an operating pager. Previous drafts of the same provision stated that there would be a certain number of pagers in regard to which the subscribers “are not more than 30 days in arrears in their payments to the company.” However, the Vencor Agreement does provide that the terms of that agreement will be subject to the signing of a more definite statement acceptable to both parties.
Vencor sent Dittman a draft of a more definite statement on April 27, 1989.[7] It *515 contains the following definition of a “paging unit”:
“A ‘Paging Unit’ means a pager used by a subscriber to the relevant service at the regular monthly rate existing on the date hereof ... who has been a subscriber for at least Thirty (30) days prior to the Closing Date and has not given notice of termination of service: (i) whose payment for service is not more than Sixty (60) days past due from the billing date; or (ii) for purposes of computing the number of Paging Units at Closing, whose payment for service is more than Sixty (60) days past due from the billing date if such subscribers have been making regular payments to the Corporation.”
This definition of a pager differs from the definition contained in the provisions drafted prior to the April Agreement in that it allows for a subtraction from the total number of pagers only as to those that are 60 days in arrears and it does not allow for a subtraction of pagers as to which payments are more than 60 days in arrears if such subscribers have been making regular payments. The draft of a more definite statement was not signed by Dittman or by a representative of Vencor.
Stiegler’s attorney, William Kimbrough, inquired of Friedlander as to the definition of a pager. In a May 4, 1989, letter to Friedlander, Kimbrough informed Friedlan-der of his understanding of the definition of a pager:
“By copy of the letter, I am advising my client that a pager or two-way radio as contemplated in paragraph nine of the proposed buy-out agreement by Vencor to Mr. Dittman contemplates a subscriber for thirty days or more whose account is not more than sixty days past due.”
In a May 19, 1989, letter, Kimbrough restated to Friedlander his understanding as a result of conversations between them as to the definition of a pager. Kimbrough also reiterated Stiegler’s position that the agreement between Dittman and Vencor was nothing more than an agreement to agree.
On May 23, 1989, Friedlander stated:
“In response to your letter of May 19, 1989, we take the position that you are incorrect in your assertion that we have an agreement to further negotiate. We have a set price, and all of the terms of the agreement are set forth. It is quite obvious that it is always necessary to have more definitive agreements with reference to minor matters, and we think that the [Vencor] agreement that we forwarded to Mr. Stiegler meets all of the terms of right of first refusal that Mr. Stiegler may have. We do not confess that he has any such rights, but since he was claiming them, we offered them to him nevertheless. We are only interested in a sale, not who purchases.
“We do not have any more definitive agreement at this time. We have advised you of the definition of pagers and two-way radios as you indicate, the exact warranties that we will be required to give have not yet been determined, but it is our position that other than any warranty set out in the initial agreement, a copy of which has been furnished to you, that we are not going to give any other warranties other than a warranty that we had 6,565 pagers and mobile units at the time of closing, and any other guarantees contained in the document that you may already have.”
It is not disputed that Stiegler did not receive a copy of the draft of a more definite statement until after the institution of this action.
On May 26,1989, shortly before the expiration of his alleged right of first refusal, Stiegler sent a letter to Dittman in which he stated that, although he did not think the Vencor Agreement constituted a bona fide written offer, he would exercise his right of first refusal if that agreement was determined to be a bona fide written offer.
On May 31, 1989, Friedlander replied as follows:
“I am responding to your letter of May 26, 1989, to Bernard S. Dittman.
[[Image here]]
“I think there is no question but that we have received a bona fide written offer to purchase. [W]e have interpreted *516 your letter of May 26 as a refusal of the right of first refusal, and will go forward with our sale.”
Both parties testified at great length regarding their understanding of the April Agreement. Suffice it to say that Stiegler testified that, despite his efforts to determine the contents of the draft of the more definite statement of the agreement between Dittman and Vencor, he has never been able to ascertain from Dittman the specific definition of a pager agreed upon by Dittman and Vencor.
Roger Wettlaufer, Stiegler’s accountant, testified that he reviewed the April Agreement, and that, if the agreement had had a definition of a pager, he could have determined from it the purchase price of Ditt-man’s stock. He then said he received the definition of a pager from Stiegler.[8]
Dittman testified that he was not able to reach an agreement with Vencor concerning the purchase price of his stock in AMPI vis á vis the definition of pagers in operation. He also said that the definition of a pager in the draft of the more definite statement — a pager whose subscriber’s account is not more than 60 days in arrears— was not satisfactory to him. We note that neither Dittman nor a representative of Vencor signed the draft of the more definite statement.
Malkove, Dittman’s agent, testified that the April Agreement was no more than a “letter of intent,” that is, an agreement to continue negotiating based on the “parameters drawn up [i]n the [Vencor Agreement].” He said that Vencor submitted the draft of the more definite statement and the parties negotiated the particular provisions of the draft, but that they never reached an agreement on the definition of a pager.
A.
Stiegler argues that, because Ditt-man insisted to him that Vencor had made a bona fide written offer that he would have accepted, Dittman is estopped from arguing that he did not receive such an offer. We hold that this argument is without merit.
In order to invoke the doctrine of equitable estoppel, the person seeking to assert estoppel must be materially harmed if the person against whom the doctrine is asserted is allowed to assert a claim inconsistent with his earlier position. Transamerica Commerical Finance Corp. v. Union Bank & Trust Co., 584 So.2d 1299 (Ala. 1991); General Electric Credit Corp. v. Strickland Division of Rebel Lumber Co., 437 So.2d 1240 (Ala.1983). It was Stiegler’s position that Dittman had not received a bona fide offer from Vencor that Dittman was willing to accept. His decision to exercise his alleged right of first refusal was made in an “over-abundance of caution.” Thus, we conclude that Stiegler has not been materially harmed by Ditt-man's claim that he did not receive a bona fide written offer that he was willing to accept, and that, therefore, Dittman is not estopped from arguing that claim.
B.
Stiegler also argues that the trial court erred in holding that the Vencor Agreement did not contain sufficient terms to be binding on Vencor and Dittman. Dittman argues that the trial court correctly found that the agreement between Dittman and Vencor did not contain sufficient terms and that it correctly found that the Vencor Agreement was nothing more than an agreement to agree.
The trial court’s final order states in pertinent part:
“The court having observed the demeanor of the witnesses and having heard their testimony, the evidence in this matter having been produced in open court, and the court having considered the exhibits introduced, and the same having been considered and understood by the court, and the court having con *517 sidered all motions and pleadings filed herein, and arguments of counsel for the parties, the court finds and concludes as follows:
“FINDINGS OF FACT
“That on or about April 14, 1989, Defendant Dittman received a document from Vencor, Inc., purportedly offering to purchase a majority of Dittman’s stock in AMPI. This document was furnished to Stiegler with a letter of transmittal which has been introduced into evidence, and Stiegler responded to the same by letter which has been introduced into evidence.
“The court finds that the document presented from Vencor to Dittman did not constitute a ‘bona fide written offer’ as those terms are used in Section IX of the above referenced agreement. Specifically, the Vencor, Inc., offer did not contain sufficient terms and agreements to be an agreement certain, it did not contain an escrow agreement, nor the terms thereof, did not contain a definition of two-way pagers and radios, both terms being essential to the formation of a contract, and that there was no meeting of the minds of the parties.
“Insofar as Stiegler is concerned, Ditt-man treated the document received from Vencor as a valid offer to purchase; however, insofar as Vencor was concerned Dittman did not consider the document acceptable or valid and continued to negotiate the terms thereof.
“The heart of the conflict lies in the realization by the parties that under the Vencor [Agreement] Dittman would not have included in the sales price computation the units on which payments had not been made for 60 days and thereby to his detriment greatly reduce the sales price. Such would have an opposite result on Stiegler’s computation and would allow him to acquire a large number of units at no cost.
“CONCLUSIONS OF LAW
“The Vencor, Inc., document is not sufficiently definite and certain in its terms such that if it were accepted it would constitute a binding contract. The Ven-cor, Inc., document is nothing more than an agreement to agree in the future and is therefore not a bona fide written offer.”
(Emphasis added.)
The elements of a contract are agreement, consideration, two or more contracting parties, legal object, and capacity. Lawler Mobile Homes, Inc. v. Tarver, 492 So.2d 297 (Ala.1986); Freeman v. First State Bank of Albertville, 401 So.2d 11 (Ala. 1981). There is no dispute that all but the first listed element of a contract are present.
Stiegler argues that the following language in Lawler Mobile Homes, Inc. v. Tarver, supra, should control this Court’s resolution of the issue before us:
“[A] contract may consist of several communications between the parties, some in writing and some oral, each constituting a link in the chain which comprises the entire contract. Air Conditioning Engineers, Inc. v. Small, 259 Ala. 171, 65 So.2d 698 (1953).”
492 So.2d at 304.
Dittman argues that the Vencor Agreement was an agreement to agree, and that agreements to agree are unenforceable. He cites Dixieland Food Stores, Inc. v. Geddert, 505 So.2d 371 (Ala.1987). See also Clanton v. Bains Oil Co., 417 So.2d 149 (Ala.1982); Coley v. Lang, 339 So.2d 70 (Ala.Civ.App.1976).
The trial court held that the parties did not have a meeting of the minds, and that, as to certain matters, including the definition of a pager, the Vencor Agreement did not contain sufficient terms to be an “agreement certain.”
Although we recognize that the language in Lawler cited by Stiegler is an accurate statement of the law, we find that it does not apply to the facts of this case. In this case, the trial court, sitting without a jury, held that the Vencor Agreement was not, *518 as a matter of law, a bona fide written agreement. Only then could it have found, based on the documents and the evidence presented ore tenus, that the Vencor Agreement was nothing more than an agreement to agree. Thus, in order to reverse the trial court’s decision on this issue, we must determine either that the Vencor Agreement is a bona fide written offer as a matter of law, Coley v. Lang, supra, or that the trial court’s findings are plainly and palpably wrong or manifestly unjust. Parker v. Barnes, 519 So.2d 945 (Ala.1988). We can not hold that, as a matter of law, the Vencor Agreement is a bona fide written offer.
Moreover, having reviewed the language of the agreement, the other documents in the record, and the evidence presented ore tenus, we hold that the trial court was not palpably wrong or manifestly unjust in holding that the Vencor Agreement was nothing more than agreement to agree.[9] There were several documents passing back and forth between Dittman and Ven-cor, each different from the preceding document. The drafts of the Vencor Agreement defined an operating pager as a pager whose subscriber’s account is “no more than 30 days in arrears in ... payments to the company.” The language found in those drafts concerning the definition of an operating pager is not found in the corresponding provision in the Vencor Agreement. In addition, the Vencor Agreement states no fewer than three times that “[t]he terms of this Agreement will be incorporated in and be subject to the signing of a detailed formal, definitive agreement.” Later, Vencor submitted to Dittman a draft of a more definite agreement. That document provided a definition of a pager slightly different from the definition found in the drafts of the Vencor Agreement. Both Dittman and Malkove, Dittman’s agent, testified that Dittman and Vencor did not reach an agreement on the definition of a pager. Although Stiegler’s testimony conflicted with the testimony of Ditt-man and Malkove, we can not hold that the trial court erred in finding, based on the Vencor Agreement, the draft of the more definite statement, and the evidence presented ore tenus, that there was no meeting of the minds on this essential point of the negotiations between Dittman and Vencor. Consequently, we hold that the trial court did not err in holding that the Vencor Agreement did not constitute a bona fide written offer.
III.
Based on the foregoing, we affirm that part of the trial court’s judgment holding that the Vencor Agreement did not constitute a bona fide written offer, and we reverse that part of the trial court’s judgment holding that, as a matter of law, Stiegler has a right to first refuse an offer for the sale of stock held in AMPI by Dittman. We remand this cause to the trial court with instructions to hold an evi-dentiary hearing to determine whether Stiegler has a right of first refusal. The trial court is further instructed to issue an order enjoining Dittman from selling his stock in AMPI until this issue is resolved.
89-1492, AFFIRMED.
HORNSBY, C.J., and MADDOX, ADAMS, HOUSTON and INGRAM, JJ., concur.
SHORES, J., dissents.
89-1508, REVERSED AND REMANDED WITH INSTRUCTIONS.
HORNSBY, C.J., and ADAMS, HOUSTON and INGRAM, JJ., concur.
MADDOX and SHORES, JJ., dissent.

. Formerly Callpage, Inc.

. Apparently, this agreement also constituted an employment contract; however, the provisions of the agreement are silent as to the terms of Stiegler’s employment.

. The exact date is disputed; however, for the disposition of this opinion, the date given will suffice.

. At some point in the negotiations, Vencor reduced its offer, so as to offer to purchase only 70% of Dittman’s stock.

. Apparently, for reasons unimportant to the dispostion of this appeal, Dittman had repurchased from Mobilphone its 1,000 shares of stock in AMPI.

. The definition of a pager is essential to the bargain, because it would affect the purchase price of Dittman’s stock.

. Stiegler referred to the April 27, 1989, document as a "draft” of a more definite statement. The document is entitled "Stock Purchase Agreement.” However, Dittman does not dispute that the document is actually a draft of a more definite statement.

. Stiegler provided Wettlaufer with the same definition of a pager as that contained in the draft of the more definite statement.

. Our decision in this case is based on our application of the law to the facts concerning the definition of a pager. Having determined that the trial court’s decision on this basis was not in error, we need not address the correctness of its decision concerning the escrow agreement.